Case number 08-2228, consolidated with 09-1289, Hedlund & Hanley v. Thrush Edgewater Partners. The case number is Hedlund & Hanley v. Thrush Edgewater Partners. Good morning. Welcome. Would counsels for the Hedlund & Hanley case please approach the bench and could you let us know your names and who you represent. Stephen, S-T-E-P-H-E-N, middle M, last name Comey, K-O-M-I-E on behalf of the appellant and cross appellee. Good morning, your honors. Martin Oberman on behalf of the appellee cross appellant. Good morning, sir. Good morning. We were thinking that 20 minutes in total for each side might work and we would let the two of you decide how to handle the cross appeal that's at issue here also in terms of when you want to argue that. The way the rule is like 20 minutes per side and 10 rebuttal. I mean maybe we should dedicate 5 to the cross appeal or something like that, you know. I guess to me it will depend on where the questions come from, but I assume that he would argue his first appeal and then I would argue a response to that and cross appeal and then he would rebut and then I'd get the last rebuttal. That was my assumption. Okay. That's fine. So would you like to begin? Whatever you want. Okay. I'll be ready. Okay. Well, first. Please raise your voice up because we have lots of people who are very interested in hearing the case. Okay. Well, first, good morning and thank you for inviting us in on what's a very rare occasion to those of us in the practicing bar to get to walk down the hall of the pantheon of judges who either broke me in or tried cases against me or I had an opportunity to learn a great deal from. I'm here today complaining about a miscarriage of justice in a civil case, which I imagine is rare but does occur from time to time. And in this particular case, the case was tried upside down. The court behaved as though the court had granted summary judgment on the principal issues to be tried in front of a jury, which we were entitled to constitutionally. And what happened was that the summary judgment ruling, which denied summary judgment, denied that the court  adopted a contract which existed between a party that wasn't in the case and one that was in. There were a total of six agreements between lawyer and client here, but there were four entities, legal entities, partnerships, law firms, which were the contracting party. So three of those were not in front of the court. They'd been dissolved by the time the contract had been fully paid on. The 1999 contract had been fully paid. There were no monies due or owing under the 1999 contract. The law firm had been dissolved. And if anyone didn't know it, they sure knew it when this court decided the City College's case because the court announced in its findings of fact, in the opinion of this court, that that law firm had been dissolved in 2000. And a new firm had been created in 2000 that took over. So this trial court, in the middle of, and summary judgment was advanced at the instigation of the plaintiff before discovery had been complete, before the answering period had completely run, because a number of the original complaints were contested. And so we were on, I believe, the second amended complaint when the court was granting summary judgment and the answer still was not due. In addition, we were dealing with the problem of the defendant always complained that the contract that was applicable was a fee limitation contract. In other words, a cap letter. Now, I think you can search the jurisprudence of our state long and hard to find a case where you're going to find a fee cap letter in the literature of the law that we have in our state. And we don't even see it in terms of the ARDC enforcement of the rules under the Code of Professional Responsibility. There are no cases on fee cap letters. So this is a unique invention in this particular case by the lawyer who is representing the client who is now on the sixth agreement or memorandum concerning the question of fees for which fiduciary responsibilities kick in. Because once the lawyer has one contract with the client, after that, the lawyer has to say, well, you know, if you want advice about this contract, you've got to go find somebody else and talk to them. And this is available for you to deal with. May I interrupt for a second? Of course. You have 11 issues on appeal. You've got a lot of stuff in here. And I'm assuming you're going to stand on your brief on some of them. I would have to. Otherwise, I'd be the most boring person you'd run into. Right. We're here to the end of time. Can you tell us which ones you think are dispositive? Summary judgment. Right. And that's not – from what I can read in your brief, you feel that's your strongest argument, or at least you devote a good portion of your time to that. And the rest of these are – as I'm seeing them, they're evidentiary issues, correct? I don't believe so, Your Honor. Well, four is an evidentiary issue. Motions eliminate five. It's a jury instruction. Sorry. Six is a jury instruction. Seven is a jury instruction. Eight is an evidentiary issue. Nine is a directed verdict. And then ten is – you know, it's cumulative. But you know, obviously – tell us which ones you're going to argue so I can get my head together as to where we're going. Okay. Summary judgment would be the principal question. I think the skull and crossbones jury instruction is pretty obvious to everybody here. It's non-IPI. The trial judge herself called it a skull and crossbones jury instruction. I have yet to see a skull and crossbones jury instruction in our jurisprudence. The lawyers on either side or the judge describes it as such. I think that the fact that we weren't allowed to have reputation evidence admitted of any kind, I think that argument stands for itself in the brief. And you know, you could – it's historic in Illinois that people get confronted on their reputation for truthfulness in the trial courts. Even a criminal defendant gets confronted, you know. And so to me, the most principal argument is the summary judgment one. Does that answer your question? It does. You have a lot of things here and I want to know which ones you're going to argue and which ones you're going to stand on your brief. Okay. Thank you. I appreciate that. The 1999 contract being enforced ignored the fact that there were three subsequent law firms in time. And there is no instrument brought into the record transferring the contract to any of the subsequent law firms. So that there was no assignment of rights under that contract to a subsequent law firm for enforcement. And actually all the fees under that had been paid. One of the judge's findings were that all the bills prior to April had been paid. April 30th had been paid so that – of 2005. So there was no way to enforce prior contracts. And even if there were, it came to a crashing halt when the trial court in Chicago awarded all right, title, and interest to any claims from the Traffolet version of the firm, Firm 3. All claims from that were awarded to Mr. Koenigsegg. And he was the only one who could legally enforce claims. So even if, you know, you were to say, well, he could bring the contract forward from three different firms, it hit a brick wall the moment that the trial court in Chicago awarded everything to Mr. Koenigsegg. So what agreement was the jury instructed on? The jury was instructed on the 1999 agreement because the trial judge admitted that into evidence during the trial. So can I just jump to the summary judgment itself? Because it seems like your opponent throughout his discussion of that process indicates that it was your failure to challenge the sufficiency of the affidavits that were presented. It was your failure to provide other evidence to the contrary that the judge could rule on, which supports the ruling that the judge ultimately breached. And I'd like you to respond to those arguments. To answer your question directly, the judge had in our filings had the agreement of April 30, 2002, the letter where plaintiff wrote the defendant stating a new retention agreement would be sent. That's the notice to admit. You can find that at volume 5C1087. The transmittal letter enclosed with the May 16, 2002 agreement said, quote, enclosed is the new retention agreement, notice to admit, volume 5C1088 is where you can locate those in the record. So I knew you would ask, and I want to make sure you understood. The trial judge knew because she had our notice to admit filed with her. And from the beginning, we always argued that that 1999 agreement did not control the relations between the parties, that the decision defines logic in this respect. If you charge fees at so much per hour, and that number advances every time you change law firms, to the amount that you're actually charging the client in 2002, that's not the 1999 term. But didn't she find that essentially the 99 fee agreement together with the cap letter constitute the ongoing contract? Didn't she find it was a contract? She didn't know all the terms. Well, one of the major terms is how much you pay per hour. Most clients only care about the hourly rate. You know, they don't care about the rest of the boilerplate. I mean, any of you who've signed a contract with a client know the client looks very closely at the hourly rate, the one-third contingency agreement. That's what they look at. They don't bother to read that if you ruin my vacation, you'll have to pay the cancellation fees. That to them, it just goes right over their head, and they don't pay attention. But what this client and every client paid attention to was the hourly rate. But then that's followed up with the checks. Right, but I feel like we're moving away from my question, which is... I'm sorry? Am I hearing you to say that she didn't properly consider the cap letter? Because she incorporated the, she made a finding that the cap letter together with the 1999 fee agreement, that constitutes the ongoing contract. That was a mistake, because the contract that was applicable was the last one in time sent by Mr. Hedlund on behalf of the LLC to the thrush companies, which checks issued to pay at that hourly rate. So if she was incorporating the proper agreement, she would have taken that from the notice to admit and incorporated that agreement and said, well, now I'm supplying the hourly term from the 2002 agreement, but we're not going all the way back to 1999, because in 1999, you're paying $100 less an hour, or $200, or whatever the number was. Okay? The other thing that you can tell that these agreements changed over time is there's no attorneys' fees provision after 1999. And that's very significant, because this court decided a case called In Re, the Marriage of, I have to look it up here for you, but there was a marital case that talked about that you couldn't enforce attorneys' fees against the client because of fiduciary relationship and the presumption of unfairness involved. And I cite it in the proof. I apologize. I had a broken shoulder, and the drugs you take for it wipes out a good portion of the memory. But my memory about what happened here was we were complaining that you can't enforce the old contract because of the cap letter, and that the cap letter put several changes into the agreement. It novated the And that's one of the fascinating things about this case. You have Stage 1, Stage 2. No trial in Stage 2. That's getting prepared for trial. Stage 3, the money kicks in for trial. Stage 4 is if the trial lasts more than a month. Stage 5 is what happens in post-judgment time. There was no carved-out area for settlement. And as we all know, settlement can occur at any minute in any case at any time. We could settle this case in the hall after we walk out of here. But the case settled without a jury trial. And we kept on saying to the trial judge, look, you had a fee cap here. He could only be paid, the LLC could only be paid the amount of money that was entitled to by Stage 2. The case never advanced beyond that. Well, the trial judge made the mistake of focusing on the 1999 letter with a, all over the top of the case and then turned to the name on the top of the letterhead. And they were different. So, I mean, clearly, if, you know, under the jurisprudence of our state of summary judgment of any kind, and we didn't get summary judgment here. That's one of the big mistakes in the case is the judge did not grant summary judgment on the question of any of this other than the costs, which were not in contest. And a trial judge in Illinois is not a federal judge who gets to make fact findings at the summary judgment stage. The judge makes the fact finding that there's no contested issue of fact. That's the fact finding, not all these facts are discreet and this is going to govern the case from here on down, which is a big difference between the federal rules and the state rules that were applicable. So, it's my position that... Can I ask you something? Your worthy opponent says that the May 16, 2002 letter was never signed by Mr. Thrush and never accepted by Mr. Thrush. You're saying it's a critical document. How do you respond to that? The leading case on that is City Colleges, which is their case. And City Colleges said it doesn't have to be signed because the board of the City College with Mr. Hedlund didn't sign the letter. But the board approved the paychecks and the paychecks transferred from the City College to Mr. Hedlund's law firm. And the City College's case, which came down the middle of our trial in our case and was immediately brought to the trial judge's attention, made it clear that the payment of money by the client to the lawyer alleviated the requirement of a signature because the conduct of the parties during the course of the transaction indicated an adoption of that program. And so your case, the City College's case, which and the identical lawyer who argued that case, everybody had to know that even if they can't find the signature page of Mr. Thrush, and the burden at the summary judgment stage is upon the plaintiff, not on the defendant, because the defendant's opposing summary judgment in this scenario. So the burden to achieve and put in all the necessary evidence to achieve a summary judgment rests on the plaintiff. But the City College's case, I believe, Justice Gallagher, answers your question because it is at the heart of the matter. The trial judge said they were paid through April 30th. What were they paid on? It had to be on the hourly rate. The hourly rate got them paid through that period of time until April 30th. So you're saying they acted on it as if they had received it? Right. Right. And they weren't complaining that they weren't paid before April 30th. And now we have this fee cap letter that's adopted in September, so there's at least in conjunction with the fee cap that came in. And there's no question both parties signed that and that that was negotiated between the parties. Now, since time is short, if I can take that forward to the directed verdict stage, okay? Here we are now facing directed verdict, and I'm telling the trial judge, look, you have a fiduciary here. The fiduciary has a duty in connection with the client, and there is not a scintilla evidence in the record that he told the client to go to another lawyer if he wanted to while he's negotiating the fee cap. There's not a scintilla evidence that with respect to the letter where the new retention agreement comes out that there's any suggestion they should go to another lawyer. Trial judge says, yeah, that's the correct standard. Clear and convincing evidence that there hasn't been an overreaching here is required. But then the trial judge went on to say, I can't decide whether this is against what a reasonable jury would do. Well, we suspect that that's not the law in Illinois. In Illinois, the trial judge has to scrutinize the record to see whether each and every element required by law is in the record at the moment you ask for a directed verdict. And if one of the elements is not there, then the trial judge has to say, sorry, directed verdict granted, or I'm going to allow you to reopen your case for you to put in the missing elements. Well, Mr. Olderman never asked the trial judge to reopen. The motion was never made. The ruling was made based on the record as it existed at that moment. And so consequently, we have a decision concerning Mr. Hedlund, who agrees on the witness stand that he's a fiduciary to the client at the time that these agreements are negotiated. So I just wanted to bring that forward to that particular point. I think I've probably exhausted your patience on summary judgments, so if I can move on to something else. But this, you know, you've got to say, why are you confronted with maybe 300, 400 pages of reading in this case? It's because the rulings don't match the record. If you, how do you not grant a directed verdict if you don't have evidence on a point? How do you, in a summary judgment matter, plug in a party whose name isn't on the face of the complaint? You know? I mean, these are legitimate complaints about the fairness of the process. The jury instruction. And I think this is something that you could really publish a great opinion on if you decide to publish. And that's what is the right instruction when a judge decides that the contract on its face in her ruling was ambiguous? It was subject to, in her mind, it was subject to two interpretations. And she said two reasonable interpretations. So that the Thrush companies had one reasonable interpretation that each stage of that contract had a cap. And they had to pay no more money unless it advanced to the next stage. The Hedlund camp sees that very same contract as being the entire budget for the case, and I get $325,000 no matter what I do. This is the case budget. And I'm going to get $325,000. And what I find suspicious here is, both in city colleges and in this case, the final number claimed from the party that doesn't want to pay is $300,000. In both cases. And it seems to be that's the number. In that case he was entitled to a bonus for good performance. In this case it's for settlement. Now we all know if you don't call a jury, I mean if we look at the cases historically since the Marshall Court, the Supreme Court, Marshall, a jury trial doesn't begin until the first juror is sworn and we have a sworn witness sit in the courtroom. That's in the criminal side. Even if we relax that standard and say a juror has to be sworn to have a jury trial start, on the civil side, you know, we had no jurors even called down to the courtroom. Judge O'Brien took them into the back and started a settlement conference, which you're all familiar with because we've all tried cases. The judge says, come on back, fellas, let's have a conversation. Let's see if we can settle this case. There was never going to be a jury trial that week. It was the 4th of July. How many juries you see sitting down the street here on the 4th of July? They went in the back, they settled the case. We believe Mr. Hedlund was limited to the amount of money he earned by preparing for trial through that date. A hundred and some thousand dollars. Not any more. The jury instruction phase. I would like you to, because this is an area you could clarify. The Skull and Crossbones instruction contain if and only if. I challenge you to read the IPI and find anywhere where you say only if is in any jury instruction you ever asked the judge for or any judge you ever known has ever given. If and only if you cannot determine the meaning of the language intended by the parties after considering the factors listed in the previous instruction, then as, quote, a last resort and only as a last resort, the contract is to be interpreted against the party that wrote the contract. Now we all know from the first hour we were in law school that anyone who writes a contract, the drafter, the law interprets it against the drafter. That's been the law and even they teach that in business law to people who don't go to law school. So I mean it's a really commonly well-known concept. Jury would understand that if they had any kind of business law in their background from a high school, college, wherever the course might have been taught. We, on the other hand, offered another instruction and we'd like you to approve this if it's possible in the way that you see the case at the point to do. A provision in a contract is ambiguous when it's susceptible to more than one interpretation. The court has concluded the contract is subject to more than one reasonable interpretation. In considering the evidence in this case, it is for you to determine the intent of the parties in entering into the contract. If the evidence in this case fails to resolve the ambiguities of the contract terms, you must construe the terms of the contract against the party responsible for drafting it and in favor of the party who did not draft it. Now that clearly sets forth what I consider to be something of reasonable jury. And you know when we teach law students, I'm sure you've been out lecturing yourselves, we say that the average intelligence of a jury is somewhere between 12th grade and college when we talk to a jury. So the reason the IPI came into existence was to make it understandable to people who had a college education or less than a college education at the 12th grade level. And as we look at all the work the IPI committee has done, it's been to make these jury instructions understandable. The effect of the judge's own description of the Scullin's crossbones instruction, that's the one she gave it, was to deny the client, our client, the opportunity for this jury to resolve the case on the law as it stands in Illinois. And Mr. Coleman, I'm going to ask you to start wrapping it up because we need to hear from closing counsel. Very good. The other thing that I think really bothered me here was not being able to confront the witness on the opinion for reputation of somebody who's testifying. And if the jury is deciding who's telling the truth, it really is critical for the jury to hear opinions about what people think, as we call it reputation evidence, in the community for truthfulness. And Mr. Hall Adams, who was an employee of the plaintiff, was on the witness stand. And Mr. Adams was offering his opinion of the truthfulness of the plaintiff himself, Mr. Hedlund. And the trial judge refused to follow the Illinois law, which has been here since 1818, which is you can confront a witness at any time in any case about the reputation of that witness for truthfulness. And what reason did the trial judge give for denying you that right? I believe her concern was, is that it wasn't specifically set forth in 13G, 213G. Isn't there also the concern that we begin to get a trial within a trial and it gets very tangential and the jury is confused and it gets, I think that's a judge's discretionary call, don't you? Well, discretionary in the sense that extrinsic evidence of what you call the trial within the trial within the trial is not permitted. But the three questions that are usually permitted is, in the community where you work and live, have you heard the reputation of Mr. So-and-so? Are you familiar with the reputation of Mr. So-and-so for the character trait of truthfulness? What is your knowledge of the character trait? And then that person tells the community opinion of the character trait. I think in a civil case that would be a very unusual discretionary thing to allow. Well, what about the... I know you're an expert in criminal law and you've done it many times in criminal law in federal and state courts, but I sat in law division for six years and I never saw anybody do that. But that doesn't mean that Cleary and Graham are wrong. No. Cleary and Graham are usually correct. I mean, I'm taking this from Cleary. What I'm saying is... And I'm agreeing with your point. The judge can say, look, he's a party. I'm not going to let you get into the reputation. We're talking about let's stick to the issues, let's stick to the merits, and let's decide the case in the merits and let's not get into someone's reputation. So we're talking about a fee dispute. I think that's a little tangential. So I'm just responding to your argument. You're making it sound as if the trial judge did something horribly unusual, and I don't think it's that unusual. That's all I'm saying to you. I will grant you that most civil cases, we don't have a reputation of a witness that is unusual. I grant that point. But there can be in the case. There can be. And Mr. Adams had information, and the offer of proof that's in the record shows you what he was going to testify to in response to that question. Now, she cut me off before I was able to do that, and I don't know that judges are allowed to cut you off unless you are getting, you know, cumulative and going down the road. But Mr. Adams... He's already known whatever he accused you of, of course. Oh, come on. They have to. They have to. I've been trying cases 35 years. Speaking of which, I think we get the picture here. So at this point, I'm going to ask that you allow your opponent to... Thank you for hearing me. Okay. Thank you, Counsel. May it please the Court, I'm Martin Overman on behalf of the plaintiff. I'm going to take the Court's admonishment seriously. I struggled with the same question, Justice O'Brien, on where to start and where to finish, because there are so many issues raised in the briefs, and I think on most of them, we can't stand on our briefs. But I would... Obviously, you'll tell me what you need to hear from me, but I'll try to... Let me try to talk about some of the questions that the Court was interested in here with Mr. Comey. I think Justice Gallagher got it right. This is a case to collect an approximately $300,000 overdue fee for legal services on a written contract. That's what this case is. The defendants turned it in to... When he says, why was there a stack of papers, it wasn't the plaintiff who turned it into a stack of papers. This case went on and on and on, and the trial judge made that very clear in some of her rulings towards the end. The case was... We filed a summary judgment, as we are... He talks about it being premature. The statute could not be more clear. You can file a motion for summary judgment when it's time for the defendant to answer. We filed the motion. I even told Mr. Comey, I called him and said, we're going to, it's just a collection case. He managed to avoid filing an answer in this complaint for 18 months. 18 months on a collection case, on a contract, repeated motions to dismiss and so forth. He asked for time for discovery to respond to the summary judgment motion, and the trial judge gave him as much time as he wanted. He has it in his brace. We were deprived of discovery. He never was deprived of discovery. He took the depositions of the lawyers, Mr. Hedlund and the other two lawyers who worked on the case. I took the deposition of Mr. Thrush. He had all the time in the world. Now, what was the summary judgment about? We filed a verified complaint, Mr. Hedlund's affidavit. And here's the fact situation. Mr. Hedlund had a firm called Hedlund Hanley and John in 99. In 2000, it became Hedlund Hanley and Trafalet. And in 2001, another partner was brought in and it became Hedlund Hanley, and some other names. There was never a change in the original fee agreement of March 19th. During any of that time, there's no writing, nobody suggests it. Mr. Hedlund's affidavit for summary judgment and his verified complaint says, Mr. Thrush and I agreed that as our firms were changing, we were just going to continue to make this fee agreement, the March 19th agreement, the agreement we were going to operate under. And was that allegation in the summary judgment or in the affidavit ever refuted? Never denied. Never objected to. And this question... And was there ever a counter affidavit filed that put that question in dispute? Never. But here's exactly what was put into dispute, Your Honor. I might say, first of all, I wanted to deal with this question of the... Well, let me answer that specifically. Mr. Thrush filed an affidavit. And what he said in his affidavit is that that's not the contract. Only the September 2004 letter is the contract. That's all he said in a conclusory fashion. Well, that's a denial. It's a denial. Well, you have to look at the actual words of the contract, of the affidavit. What he said was... It wasn't really a denial. Here's what's the actual words of it. Paragraph 3 of his summary judgment affidavit. It's in volume 5 at page 1032. It is the understanding of the affiant that the March 18th letter does not provide the terms of the contract which controls this allegation. It is the understanding of the affiant that September 4 is the controlling contract. That's a legal conclusion. And we cited cases in our summary judgment brief. There's a case directly on point, and I believe it's in our brief, that says an affidavit based on understandings and so forth does not put facts into controversy. They never said, for example, and I took Mr. Thrush's deposition. Mr. Thrush never said, Mr. Hedlund is wrong. We did not agree to continue operating under the March 18th agreement. He never said that. And he was asked. But what he said was... When the question was asked, were you operating under the March 18th agreement, what was the answer? The question that was asked, Your Honor, was, did you get a new contract? He said, I never insisted, and I quoted it in the brief, we never insisted on getting anything new in writing. We just continued on. That's how he answered the question. Was he ever asked, was there an addendum to the original 1999 agreement? He was repeatedly asked, did you sign a new agreement? Was there a new agreement? And I... What were his answers? His answer was, A, I didn't insist on getting a new agreement signed, and B, I don't remember. Those were his answers. Repeatedly. And I quoted that. And so, it was put directly in issue in front of the trial judge at summary judgment. And they could have, and they never did. And if you look at their summary judgment brief, Your Honor, on page 8, which is at page 104 of volume 5, and I cited it, in their summary judgment, this is dealt minimally. It's dealt in about 10 lines. All they say is, here was the... Remember, summary judgment procedure. We put in an affidavit saying there was an agreement between the parties to continue operating under the March 18th agreement. It's a very explicit statement. Under summary judgment law, it becomes their obligation to controvert that fact. Here's what they said, and this is all that they said. The plaintiff... And this is in their brief. The plaintiff refers to purported agreements of March 18th, May 2903, which is unrelated to this issue, and September 4th. The defendant has contended from the beginning of this dispute that the contract is the September 4th agreement. The theory of novation would apply to the September 14th. That's all they said. The September 14th agreement was a novation of the prior agreement. They never said anything else. They never said, we did not agree to continue under March 18th. They never said some other letter, like the May 16th letter came into play. They just ignored it. So that's all the judge had in front of her. That's all she thought the issue was. And as I pointed out in the brief, for there to be a novation, there has to be some contract that it replaces. It was really a concession of theirs that the March 18th agreement replaced it. And by the way, the March 18th agreement explicitly says, I just have it here, that on this thing about the rates, it says the hourly rates may be adjusted from time to time with your approval. And over the course of the 99, 2000, 2001, the whole thing, the rates went up as they go up, and Mr. Thrush was billed, and he paid them. And the affidavit of Mr. Hedlund in summary judgment says the parties agreed and did operate under the March 18th agreement with these adjusted rates. So it's all right there. That's all that was there in summary judgment. Now, Mr. Comey talks about, well, we threw in our notice to admit. They just attached it to the papers. It had a bunch of letters, which we admitted were genuine, which were actual pieces of paper. But on summary judgment, you can't just stick under a judge's nose a whole slew of documents and say, find an issue of fact. They never in their brief mentioned the May 16th letter. Not once. And by the way, in terms of when they mentioned the May 16th letter, if you look at the time frame in this case, we filed for summary judgment in January of 06. Mr. Comey got until the fall to finish his discovery and write briefs on it. We argued it. The court decided it in December of 06, set the case for trial in June of 07. Mr. Comey got that continued until September of 07, and he eventually got it continued until December of 07. Not one time did Mr. Comey ever ask the court to look at the May 16th letter. He never came back in and said, you missed it? He actually filed a motion to revise the summary judgment ruling on the reasonableness of the fees in September of 07 on the eve of trial. He never said, by the way, we want to rely on the May 16th letter. And at trial, it was never an exhibit. It was never asked about. It was never questioned about. And if you look at the actual notice to admit the one he says was in front of them on summary judgment, and he told you where it was in the record. I didn't have the number in front of me. You'll see that after the May 16th letter, it's not just a question of Mr. Thrush not signing it. First of all, what was also in front of the judge on summary judgment was Mr. Thrush's deposition. I quoted from it in my brief. I showed Mr. Thrush the May 16th letter. I said, is this the contract? He said, I don't ever remember seeing that. Then, if you look at his letters in July, he writes Mr. Hedlund back and says, we need to have further discussions on a fee agreement. And then he writes him back again, July 26th, and he says, no, no, I want a different deal. And then Mr. Hedlund writes him in late July and says, we need to sit down and work out our fee arrangement going forward. So the parties weren't operating under the May 16th. Mr. Thrush rejected the May 16th letter. He kept for the next two years. Well, Mr. Hedlund says, well, we'll just keep operating under the old letter. And Mr. Thrush kept saying, how about a contingent fee arrangement? How about a monthly retainer? Mr. Hedlund said, I'll work it out with you. But they never did until they got to the so-called cap letter. So this whole thing about the May 16th letter is just a red herring. It comes up in the appellate court. You would think the whole trial was about the May 16th letter. If you read the appellate briefs, we never saw it in the trial court. So I don't want to use up all my time on this issue, but I think it needs to be straightened out. What's happened in this case. I think we get the point. There's a major contradiction here in terms of what happened at the actual trial level and what's being argued. As I pointed out earlier, you make very cogent arguments about waiver and certain value to challenge by way of the sufficiency of the evidence. All right. I will move on, Your Honor. I would like to just mention briefly about the jury instruction. Mr. Comey himself cites farewell against Ticklett in his brief, which says that the contra preferendum, this rule, is a last resort. That's where the words come from. And when there are no IPI instructions, Mr. Comey said this isn't in the IPI. Of course not. There is no IPI instruction for contracts. You go to the case law. So we showed the judge the case law, and she said, because this was a three-week trial, remember, over what did this cap letter mean. And Mr. Hedlund testified at length. Mr. Thrush testified at length. She said, I want to make sure that the jury understands. First, you look at the extrinsic evidence. Don't just say, well, whoever wrote it loses. First of all, you look at the extrinsic evidence, because you don't ever get to this rule if the extrinsic evidence answers the question. And she felt, and this is within a trial judge's discretion, I think it's, if there's anything that's discretionary, it's how to make sure the jury gets the law right. She said, and Mr. Comey has dwelled on this phrase that the trial judge in all good faith tossed out of Skull and Crossbones. What she was saying is, if you read the transcript, she said, it's like a warning on a medicine bottle. Don't use this last resort if you don't have to. That's what she meant, Skull and Crossbones. He said it was sort of like fatal to his case or something. So she felt the way to do this was to say, look at the extrinsic evidence, and then go to the rule if you have to. And she came up with the idea, and I thought it was really, you know, nobody likes this when you're drafting jury instructions, but I think she had a very clear idea to make sure the jury did it right. She said, I want two special interrogatories. I want to ask the jury, were you able to figure out what the parties intended from the evidence? Two, if you were not, did you have to use the last resort instruction? And we know what the jury did. The jury answered those interrogatories. We were able to decide from the evidence. And we decided what the case, and no, we didn't use the last resort. So even if there was something wrong with the wording of this instruction, and I actually, but the only thing I think I would agree with Mr. Comey about is that it might be helpful for an appellate opinion to say, here's a good instruction to use if you ever get in this situation. Because we, you know, this happens a lot in commercial cases. You're really inventive. But you're saying you don't have to go there because the jury didn't know. The jury didn't know. So error would be harmless if you don't have to go there. I couldn't agree with you more, Judge. But if you did, we'd all be enlightened on it. Now, I guess I should. Let me tell you this. I'm going to stop where I normally end on that. I learned that. Yes, I'd like to deal with the cross appeal. We had a very, very long procedure. It lasted for 16 months on what the proper fee award should be. And interestingly enough, they hired an expert witness to challenge my timesheets. They never did that, to challenge Mr. Headland's timesheets for the underlying case. It was one of the problems. But they went over my timesheets. By the time we finished with this, I had close to $400,000 in Lodestar, based on, and you've only seen part of it, but you've got a flavor of it in these briefs about every argument we had to deal with. So their expert witness challenged about 150-some of my hours. The judge accepted some of those and reached a conclusion and made, I think, in a normal, appropriate way, how to decide what a reasonable fee is. And she decided that a reasonable fee, when you add the trial time and then the fees after the trial, to $333,900. And in the brief, we pointed that out. And the defendants, and this is quite significant, they do not challenge that that's the reasonable fee. They've conceded that point. The judge made this finding. And I didn't challenge, ultimately on the appeal, I'm not challenging her reduction. I think that's right, you know, up to April 21st. Obviously, there's been time put in since then. The trial judge then said, and Mr. Comey never argued this, Mr. Comey never argued the word incurred. And so there was no briefing on how do you interpret the word incurred. He just said, you have a contingent fee, that's all you get. The trial judge said, and she's a thoughtful trial judge, and I do not complain. She said, I think the word incurred in this case means I can't give you more than your 40% contingent fee. She thinks it's a restriction or a constriction on the... Maybe even a cap. It's a cap. Maybe even a cap. A cap. She didn't use the word cap. I don't blame her at that point. She probably didn't want to use that word again. Well, I don't think she wanted to hear that word. So that became the question. Was the judge's discretion constrained by the use of the word? Now, Mr. Heblin was on the witness stand in the fee... Actually, they called on the fee hearing. And he made it quite clear that we had a contingent fee arrangement, and I just pulled out a form that we normally use, although it was in stages. But Mr. Heblin made it clear, this was uncontradicted, that his agreement with me was that that was a way of setting a minimum fee, that we all knew there was a fee-shifting clause, and that the fee was either, his understanding, either going to be the minimum or the fee-shifting award, and that there was no double recovery here. I'm not going to get both. That could not be more clear. So now the question is, what do we do with this word incurred? And so I went back to the case law, and I cited all this in the briefs. It's very clear in Illinois in contractual fee-shifting cases that the contingent fee, conceptually, is not a ceiling or a floor. The case law could not be more clear. It is one factor to be used. All of the cases say that. It's, by the way, the same thing that they say in statutory fee-shifting cases, whether the plaintiff's lawyer has a contingent fee is one factor. Now, there are a number. And actually, it was the trial judge who asked us to say, look, there are no Illinois cases that have ever actually had to decide this one way or the other as their case law anywhere else. And she asked both of us to submit briefs on it. Mr. Comey did not. I submitted one of basically the cases that are in our appellate brief. A number of other states have confronted the issue, and they have unanimously, when confronted, said it's not a cap or a ceiling. It's a factor, and it depends on the facts of the case. In Illinois, the closest you get are two cases. One is the Collins case. And the Collins case said two things, which I think are uncontested principles. It said an attorney fee cannot be based solely on an amount necessary to satisfy a contingent fee agreement. And that, quote, the fee must be reasonable regardless of any other agreements between the parties. And the language in Collins was fees incurred. Now, in that case, the attorney didn't get any fees, so they sent it back. So we don't know. They never had to come in and say. But they certainly established the principle that it must be reasonable. In the Annist case, the language was also fees incurred. And in that case, they did confront it because the plaintiff's employer, the inference was, paid the fee, and the plaintiff didn't pay it at all. And the court said in Annist it's irrelevant if the plaintiff never had to pay the fee. The fee has to be reasonable. So I think the foundation is there for the court. To say it isn't a cap, even with the word incurred, because of the overriding mandate that the fee has to be reasonable. And look at this case. If there was ever a case where you were going to have to say, what would be a reasonable fee? Here's somebody with a $286,000 collection case, and the defendant turns it into World War III, and runs up, actually, I think at this point in time, I have over $500,000 in lodestar in this case. I know I'm never going to see all of that. But is this what we want to say? To say, well, you can go barely down the street. I know there's a cap over here, and he's got this on a contingent, and we'll just make this into the most uneconomic. Maybe they will eventually go away. You know, if I had entered into an hourly fee agreement with Mr. Hedlund, we wouldn't be having this argument, because the fees incurred would be the hours. But Mr. Hedlund would not be in court, because I'm not a saint. I think I have an obligation, and I don't think I can walk away with it. But at some point on a $286,000 case, when your hourly rates have gone over $300,000, $400,000, we're not required to be in the charity business here. And these people knew it. This wasn't an accident. There were many discussions about this. The trial judge, we had him off the record. What are you doing here? Look, there's a fee shifting here. This was a conscious effort, and the trial judge talked about it. You don't have to take my word. She talked about it. She said they went out of their way, and I quoted it, to make this as complicated and as expensive as possible. Now, when you look at the equities, is this one where the contract should be construed to put this kind of artificial limit on it? I don't think so. They're still doing it in the appellate court. In terms of all of the briefing and the delay, your panel didn't have to deal with all of the contested motions on how long they had took to file the record. And I'd ask for sanctions there. And I'd ask for sanctions, by the way, in this case as well. And I mentioned that in the brief for some of the flagrant misstatements of the record. So that's my view on the cost appeal. Just let me mention one word on this question of interest, that they complain about the level of interest awarded. They never, ever argued this in the trial court. They never even argued what they've argued in the appellatory, even on a motion to reconsider. So the trial judge didn't have a chance to think about that, or the cost that they're now complaining about. Those were never objected to until the motion to reconsider. Thank you, Mr. O'Connor. Thank you, Your Honor. Mr. Komen? First, in rebuttal, let me say we denied the validity of the 1999 contract in the answer to the motion for summary judgment. And Mr. Thrush's affidavit attached said that he entered into fee agreements every time the law firm changed. So there is no doubt that at the moment the judge read that affidavit, the judge was aware that there were four separate fee agreements because every time the law firm changed, there was a new retention agreement. And that's contained in the affidavit. The law of summary judgment is affidavits must be liberally construed in favor of the non-moving party. We were the non-moving party in that circumstance. So Mr. Thrush's affidavit should have been considered more liberally as opposed to the plaintiff's affidavit, which is to be strictly construed on motions for summary judgment. There was larger argument over the effect of the fee cap letter. And clearly, that is a change in conditions that existed between the law firm and the client when it's adopted. Because no lawyer wants a fee cap letter. I mean, let's talk about it. That's the equivalent of toxic shock to a lawyer. You now are limited. It's almost as if there's a cap on what you do and you're going to be donating time if you go beyond the limits imposed. And so clearly, that argument Mr. Oberman made about donation of time on a one-third contingency also applies when you're in a cap situation because you are going to go beyond what, you know, you know when you sign that document, there will be additional time that will never be compensated if you go beyond the particular limits. So clearly, there had to be a novation of the agreement at that moment. That had to be a change in prior contracts that existed at the moment that that agreement signed in September. The court found the cap letter ambiguous. Once the judge issued those words, the court had no business adopting any part of the plaintiff's theory of the case for summary judgment. At the moment, the judge says there are two reasonable interpretations. The court simply stops and says, I cannot grant summary judgment. It doesn't need to go on and say, well, what portions of the plaintiff's theory of the case are convenient to include here. It should come to an end. On the fee petition appeal, I disagree with my colleague's statement. I think you decided this case in career concepts versus synergy. The Justice Griman, and I'm glad I can say not the late Justice Griman, but a living person justice, as opposed to the pantheon and the hall there, decided that case along with two of your colleagues, Justice Cunningham and Justice Karnesis. And in that particular case, the trial court was confronted with the plaintiff doing the very same thing Mr. Overman there did down in the trial court, and that was abandoning the one-third contingency fee agreement at the stage that the trial judge is being called upon to make a decision on, will you get attorney's fees? And the trial judge in that particular case granted what was called a reasonable attorney's fees that was in excess of the one-third contingency fee agreement. And Justice Griman wrote, with concurrence of the other two justices, notwithstanding, we must reduce the award pursuant to terms of the contingency fee agreement between the plaintiff and its attorney. The instant case is unique, however, in that the plaintiff was awarded attorney's fees in excess of the contingency fee agreement. We presume that the contingency fee agreement between plaintiff and attorney was reasonable and find it enforceable. Consequently, the trial court erred in allowing plaintiff attorney to unilaterally waive his contingency fee agreement in favor of the court's own award of reasonable fees. Now, that's exactly what Mr. Oberman is asking you to do. He and Mr. Hedlund agreed on what was a reasonable fee in order to obtain the money that was claimed owed by the last law firm here, the LLC Corporation. Then he goes into the trial court and he asks for almost $350,000 in fees beyond what was agreed to. And he was limited to a one-third contingency of what the jury verdict returned, or actually, we took the position in the trial court, it was what he actually collected. And he never, first of all, we say he didn't present that to the jury. The jury was never asked to award attorney's fees beyond, or costs, or the cost, reasonable cost of litigation. We were having a jury trial. We had a judgment. They made that judgment final with three or four findings. They then come in after that and say, okay, in addition, we want attorney's fees. Now that we want attorney's fees, we want, in addition to our one-third, we want every single hour we spent on this case in excess of the fee contract that we've entered into. And we want to abandon that. But when Mr. Hedlund was on the witness stand, I asked him, do you owe Mr. Oberman one dime beyond the one-third contingency? Answer, no. There's no legal obligation for Mr. Hedlund's law firm to pay Mr. Oberman one dime more than one-third. So that was the basis of that argument that we had in the trial court. Mr. Oberman, anything else? If I may touch on this question of last resort. Okay. One minute, please. I think we've heard that quite a bit. Lacrosse and sculling, I think we understand. Okay. Well, then, I don't wish to trespass on your patience. If you could. Okay. A statement that wasn't correct by Mr. Oberman in the heat of argument was, we hired two experts, Mr. Gillis and Mr. Reed. They filed affidavits at summary judgment stage. They were there, called in to make decisions on what was reasonableness as to fees. Mr. Oberman is grossly mistaken, because they were there, and Mr. Gillis was alive at the date of the trial. Justice Reed had passed away. But Mr. Gillis was called to the witness stand, and he was there to provide a testimony. And the judge had granted the motion in limine prior to trial concerning that. He provided an affidavit that there were hundreds of facts disputes with respect to the reasonableness of the fees, and that was supplied at the time of summary judgment. So the trial judge was aware that there was contest as to the reasonableness of fees that commenced as early as that point. I hope I haven't trespassed on your patience. Not at all. I really appreciate being invited down. The Bar Association has complained that we don't get to see enough of you. Very well argued. Mr. Oberman, is there anything else that you want to? I've got about two minutes. Okay, go ahead. It's a constant problem in this case. It's not what Mr. Thrush said in his affidavit. At paragraph 19, he said every time they changed law firms, he was asked to sign an agreement. Not that he signed one or executed one. And I dealt with this, by the way, as part of my question. Question for sanctions. Small point, and I'm sure the court knows this. Section 1005, I meant to say it when we were talking about summary judgment, clearly has the trial court authorized to make binding factual determinations, even though they're short of granting summary judgment. Mr. Comey, in his brief, cites a 1982 case called Shuttstaffer or something like that, which says it isn't the same as federal summary judgment procedure, and it was after that that the legislature changed the law to make it the same. But just so the record is clear, and I mentioned that in our brief. Career concepts. There was no discussion in career concepts about whether what the trial court had done was to award a reasonable fee. It just said the trial court awarded the fee. And the court said, we have to worry about excessive fees. And so in this case, we're saying it can only get to third. Judge McGrath was quite cognizant of that, and she even said, and I think it's quoted in the brief, here we have the opposite. If we only award 40%, it'll be under-reasonable. It's the opposite of career concepts. So the case is easily decided. I don't read career concepts as saying we have some rule in Illinois that that's always a ceiling, because the court also said it's only one factor. It repeated the... Didn't it say the standard is reasonableness? It said it's reasonableness. Has to be. Finally, on this question about not asking the jury for it, it's very hard to find cases on this, but I found one yesterday in a case that we cited, and it was yours, Justice Broussard, in the Sure Staff, I think is the case, which I cited for non-IPI jury instruction, how you do it. But it turns out in Sure Staff, if you go to the end, this same argument was made, that the jury was not asked for the fee-shifting award. And this court said, you don't have to ask the jury for the fee-shifting award. That's for the trial court, after the verdict comes in. So the law is clear. I'd like to thank both sides for the extensive and well-argued presentation and extremely well-written briefs. We'll take another advisement, and thank you for your time and effort.